**Philip PAVIA, Plaintiff,**

**v.**

**1120 AVENUE OF the AMERICAS ASSOCIATES, The Hippodrome Garage and Building Company, Edison Parking Corporation, Harold A. Gottesman, The New York Hilton Joint Venture, The Hilton Hotels Corporation and The Prudential Insurance Company of America, Defendants.**

**No. 95 Civ. 1302 (RWS).**

United States District Court,
S.D. New York.

Sept. 25, 1995.

---

Gale P. Elston, New York City, for Plaintiff.

Curtis, Morris & Safford, P.C., New York City (Adam L. Brookman, of Counsel), for Moving Defendant.

## OPINION

SWEET, District Judge.

Plaintiff Philip Pavia ("Pavia"), an artist and sculptor, brought this action alleging, *inter alia*, that Defendants, holders of one of his sculptures, improperly displayed and mutilated his artwork in violation of 17 U.S.C. § 106A and Section 14.03 of the New York Arts and Cultural Affairs Law. Defendants 1120 Avenue of the Americas Associates, The Hippodrome Garage and Building Company, Edison Parking Corporation, and Harold A. Gottesman have moved this Court to dismiss Pavia's complaint against them, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. The motion is granted with respect to all claims arising under federal law and as to those claims arising under New York law based on improper display prior to February 23, 1992. The motion is denied with respect to those claims under New York law arising thereafter.

## I. *The Parties*

Plaintiff Pavia is a professional artist and sculptor residing in New York, New York.

Defendant The Hilton Hotels Corporation ("Hilton") is a Delaware corporation with offices at 9336 Civic Center Drive, Beverly Hills, California.

Defendant The Prudential Insurance Company of America ("Prudential") is a New Jersey corporation with offices at 51 JFK Parkway, Short Hills, New Jersey.

Defendant The New York Hilton Joint Venture (the "Joint Venture") is a partnership between Hilton and Prudential with an office at The New York Hilton Hotel and Towers at 1335 Avenue of the Americas, New York, New York. (Hilton, Prudential and the Joint Venture are, collectively, the "Non–Moving Defendants.")

Defendant The Hippodrome Garage and Building Company ("Hippodrome") is a partnership having its principal place of business at 1120 Avenue of the Americas, New York, New York.

Defendant Edison Parking Corporation ("Edison") is a part owner of the premises at 1120 Avenue of the Americas, New York, New York and is a New York corporation with offices at 1120 Avenue of the Americas, New York, New York.

Defendant 1120 Avenue of the Americas Associates ("1120 Associates") is a general partnership having offices at 1120 Avenue of the Americas and 60 East 42 Street, New York, New York.

Defendant Harold A. Gottesman ("Gottesman") is an individual maintaining offices at 1120 Avenue of the Americas, New York, New York. Gottesman is a general partner of 1120 Associates. (Defendants Hippodrome, Edison, 1120 Associates and Gottesman are, collectively, the "Moving Defendants"; the Non–Moving Defendants and the Moving Defendants are, collectively, the "Defendants.")

## II. *Prior Proceedings*

Pavia filed his complaint in this action on February 23, 1995, asserting the following six claims for relief: (1) negligence against the Non–Moving Defendants, (2) fraud against the Non–Moving Defendants, (3) violations by the Defendants of the Visual Artists Rights Act of 1990, 17 U.S.C. § 101 *et seq.* ("VARA") ("Count III"), (4) interference by the Defendants with Pavia's copyright ("Count IV"), (5) violations by the Defendants of Section 14.03 of the New York Arts and Cultural Affairs Law ("Count V"), and (6) infringement by the Defendants of Pavia's copyright ("Count VI").

On May 9, 1995, the Non–Moving Defendants filed an Answer and lodged a counter-claim against Pavia and six cross-claims against the Moving Defendants.

The Moving Defendants filed the instant motion to dismiss Pavia's Complaint against them on May 8, 1995. Oral argument on the motion was heard on June 27, 1995, and the motion was deemed fully submitted at that time.

## III. *Rule 12(b)(6) Standards*

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court presumes the factual allegations of the complaint to be true and draws all factual inferences in the plaintiff's favor and against the defendant. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations set forth and considered herein are taken from Pavia's Complaint and do not constitute findings of fact by the Court.

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

In determining the sufficiency of the present complaint, consideration is limited to the factual allegations of the complaint. *See Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir. 1994).

## IV. *Facts*

In 1963, the Non–Moving Defendants commissioned Pavia to create a work of art to be placed in the lobby of the Hilton Hotel (the "Hotel") on Sixth Avenue (now called Avenue of the Americas) in New York City. Although consideration was paid for Pavia's

services, title to the work did not pass from Pavia to the Non–Moving Defendants. Pavia created a large bronze sculpture, entitled "The Ides of March," consisting of three large, diamond-shaped, standing forms and one smaller form lying on its side. Soon thereafter, "The Ides of March" was recognized by critics and the news media as a noteworthy work of art. The sculpture remained on display at the Hotel until 1988. Pavia filed for copyright registration for the work on January 11, 1995.

According to Pavia's assertions, at about the time the sculpture was commissioned, the Non–Moving Defendants assured Pavia, with knowledge that they were lying and intent to induce him to relinquish possession of his sculpture, that "The Ides of March" would be permanently and properly displayed in the lobby of the Hotel. Although the Non–Moving Defendants had no intention to display the work there permanently and properly, Pavia allegedly believed these representations to be true and relied on them in entrusting his work to the Non–Moving Defendants.

On July 11, 1988, the Defendants entered into an agency agreement, which permitted the Moving Defendants to take possession of "The Ides of March" and display the work at the Hippodrome Parking Garage (the "Garage"), a commercial warehouse located at 1120 Avenue of the Americas. The lobby and ground floor of the Garage are accessible to the public twenty-four hours a day, seven days a week.

Two of the original four bronze forms that comprised "The Ides of March" have been displayed in the Garage since 1988. The other two forms have been removed, and the work is currently displayed in this disassembled state. The improper display of "The Ides of March" is alleged to have damaged Pavia's honor and reputation as an artist, and that harm is alleged to continue as long as "The Ides of March" is improperly displayed. From 1992 to 1994, Pavia made numerous requests of the Non–Moving Defendants to display the piece properly. The Non–Moving Defendants in turn requested that the Moving Defendants return the work to them.

The Moving Defendants have so far refused to return the piece.

## V. *Discussion*

### A. *Count V*

#### 1. *The Acts Alleged Violate § 14.03*

■ Section 14.03 of the New York Arts and Cultural Affairs Law ("§ 14.03") provides in pertinent part:

> (1) . . . on and after January first, nineteen hundred eighty-five, no person other than the artist or a person acting with the artist's consent shall knowingly display in a place accessible to the public or publish a work of fine art or limited edition multiple of not more than three hundred copies by that artist or a reproduction thereof in an altered, defaced, mutilated or modified form if the work is displayed, published or reproduced as being the work of the artist, or under circumstances which it would reasonably be regarded as being the work of the artist, and damage to the artist's reputation is reasonably likely to result therefrom . . . .

> (4)(a) An artist aggrieved under subdivision one . . . of this section shall have a cause of action for legal and injunctive relief.

N.Y. Arts & Cult.Aff.Law § 14.03 (McKinney Supp.1993).

Taking Pavia's factual allegations to be true, as is required on a motion to dismiss under Rule 12(b)(6), the Moving Defendants have violated § 14.03. "The Ides of March" is a work of fine art, *see* N.Y.Arts and Cult. Aff.Law § 11.01(9) (McKinney Supp.1993), produced in a single copy. Without Pavia's consent, the Moving Defendants have knowingly displayed the sculpture since 1988 at the Garage—a place accessible to the public—in an altered, defaced, mutilated, or modified form. Pavia's reputation has been and continues to be damaged by the improper display. Although Pavia fails to allege that authorship of the sculpture is explicitly attributed to him as now displayed, the facts as alleged—particularly the notoriety of Pavia and the sculpture—directly give rise to an inference, for the purposes of this motion, that the work can be regarded by others as

Pavia's work. "The Ides of March," then, is protected under § 14.03, and the Moving Defendants' acts are of the type the statute prohibits.

## 2. The Statute of Limitations Bars Improper Display Before February 23, 1992

### a. The Statute Applies

■ The limitations provision of § 14.03 states that:

No action may be maintained to enforce any liability under this section unless brought within three years of the act complained of or one year after the constructive discovery of such act, whichever is longer.

§ 14.03(4)(b). New York courts have not addressed when a cause of action accrues under § 14.03(4)(b). The Moving Defendants argue that the claim accrued in 1988, and the three-year statute of limitations thus began to run when the sculpture was dismantled, that being "the act complained of." The statute, however, does not prohibit the actual alteration of works of art *per se;* rather, it proscribes their attributed display in altered form. "The act complained of" for the purposes of § 14.03(4)(b) is thus the display of the altered sculpture, not the isolated, one-time act of dismantling in 1988. The acts prohibited, therefore, have occurred continually since 1988, and a new cause of action has, in effect, accrued each day, with the three-year limitations period beginning to run each day that the piece has been displayed. In this regard, the limitations provision operates much like the New York common laws doctrine that continuous or recurring wrongs, such as nuisance or trespass, continually give rise to new causes of action. *See, e.g., Rinaldi v. Viking Penguin, Inc.,* 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377 (1981); *cf. Mount v. Book-of-the-Month Club, Inc.,* 555 F.2d 1108 (2d Cir.1977) (holding federal copyright law's three-year statute of limitations not to bar acts of infringement occurring within three years of action, despite fact that related, earlier acts of infringement were barred). This action was commenced on February 23, 1995. Any claims that accrued before February 23, 1992, are, therefore, barred by the three-year

limitations period. Any claims arising thereafter, however, survive the statute. The earliest of these accrued on February 23, 1992. Thus, unless Pavia lacked constructive notice before February 23, 1994, triggering the alternate provision of § 14.03(4)(b), only the improper display from February 23, 1992, and afterwards survives the statute of limitations.

■ As to the alternate one-year provision, Pavia had constructive notice that "The Ides of March" was being improperly displayed well before February 23, 1994. The Complaint leaves vague when Pavia first became aware of the improper display, but it is impossible to infer that he had notice later than 1992, when, according to Pavia's own allegations, he first asked Defendants to reassemble the sculpture. "A person is deemed to have notice when he has actual knowledge or when 'from all the facts and circumstances known to him at the time in question he has reason to know that it exists.'" *Leasing Service Corp. v. Diamond Timber, Inc.,* 559 F.Supp. 972, 978 (S.D.N.Y. 1983), *aff'd* 729 F.2d 1442 (2d Cir.). Although Pavia asserts that he lacked constructive notice, conclusory allegations need not be accepted on a motion to dismiss if they are contradicted by the details contained in the complaint. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771–72 (2d Cir.1994). It is impossible to conclude that Pavia was not on notice of the improper display, in view of his demands that the Defendants desist. Assuming that constructive notice arose on December 31, 1992, one year from that date is December 31, 1993. The "longer" of the two limitations periods is, therefore, three years from February 23, 1992.

### b. The Alleged Acts of Fraud Do Not Prevent Application of the Statute

Pavia maintains that the statute of limitations was tolled by Defendants' "fraudulent concealment" of certain facts. Specifically, Pavia alleges that at the time his sculpture was commissioned, the Non–Moving Defendants knowingly and purposely lied to him regarding their intent to display his work

permanently and properly in the Hotel, thus inducing him to produce and deliver "The Ides of March" to them. A letter from Pavia's attorney to the Hilton, attached as an exhibit to the Complaint, indicates that Pavia may have refrained from earlier legal action because of the Non–Moving Defendants' assurances that the sculpture would be reassembled or donated to a Museum. It is unclear whether Pavia intends to assert that the statute was tolled by fraud or that the Moving Defendants are estopped entirely from raising the statute for equitable reasons. Both arguments fail given the facts as alleged in the Complaint.

█ New York courts, "have long had the power, both at law and equity, to bar the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing ... which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 272 N.Y.S.2d 337, 339, 219 N.E.2d 169, 171 (1966) (citations omitted); *see Petito v. Piffath*, 85 N.Y.2d 1, 623 N.Y.S.2d 520, 522, 647 N.E.2d 732, 734 (1994), *see also Clark v. United States*, 481 F.Supp. 1086, 1095 (S.D.N.Y.), *appeal dismissed*, 624 F.2d 3 (2d Cir.1979) (*citing Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978), *General Stencils* ), *cf. Gee v. CBS, Inc.*, 471 F.Supp. 600, 624–28 (E.D.Pa.1969) (applying the more stringent federal standard in the copyright context). Pavia has alleged no such wrongdoing on the part of the Moving Defendants. His allegations of fraud and his intimation that he was persuaded under false pretenses to refrain from litigation are directed only at the behavior of the Non–Moving Defendants. Because the estoppel doctrine is rooted in the principle that "a wrongdoer should not be able to take refuge behind the shield of his own wrong," *General Stencils*, 272 N.Y.S.2d at 339, 219 N.E.2d at 171, the Moving Defendants are, therefore, not estopped from raising the statute of limitations defense. *Cf. Petito*, 623 N.Y.S.2d at 522, 647 N.E.2d at 734.

█ Similarly, the Statute of Limitations is not tolled by the alleged acts of fraud. A New York doctrine less drastic than—but often conflated with—that of estoppel, tolls the statute of limitations for as long as a defendant fraudulently conceals the existence of a cause of action. *See General Stencils*, 272 N.Y.S.2d at 339, 219 N.E.2d at 171; *Clark*, 481 F.Supp. at 1095. As in the case of Pavia's estoppel argument, however, the Complaint fails to allege or imply facts that would trigger this doctrine. The acts alleged, as discussed in the case of estoppel, were committed by the Non–Moving Defendants, not by the Moving Defendants. Moreover, no possible view of the 1963 misrepresentations suggests that they constituted a concealment of a cause of action three decades later. Even had the 1992 representations regarding the reassembly of "The Ides of March" been made by the Moving Defendants, such acts hardly rise to the level of concealment.

The statute of limitations was, therefore, not tolled for the purposes of this motion, nor are the Moving Defendants estopped from raising it. Thus, the three-year provision of § 14.03(4)(b) bars all claims arising from the improper display of "The Ides of March" before February 23, 1992.

### 3. *The Rights Arising Section 14.03 Are Not Annulled by VARA*

█ Defendants assert that § 14.03 was preempted by the enactment of the Visual Artists Rights Act of 1990, Pub.L. No. 101–650, 104 Stat. 5128 (codified in scattered sections of 17 U.S.C.). VARA explicitly addresses this issue, stating that it preempts any other "legal or equitable rights that are equivalent to any of the rights conferred" by its provisions. VARA § 605, 17 U.S.C. § 301(f)(1) (Supp. V 1993). Whether the rights conferred by VARA are equivalent to those of § 14.03 "will occupy courts for years to come...." Charles Ossola, *Law for Art's Sake*, The Recorder, Jan. 8, 1991, at 6. The matter, however, need not be confronted here, for VARA adds that nothing in its preemption clause "annuls or limits any rights or remedies under the common law or statutes of any State with respect to ... any cause of action from undertakings commenced before the effective date" of the federal legislation. VARA § 605, 17 U.S.C.

§ 301(f)(2)(A). The improper display was commenced in 1988, well before VARA's effective date of June 21, 1991. VARA § 610(a), 17 U.S.C. § 106A note. Thus, even if VARA has preempted § 14.03 since the effective date of the federal legislation, it does not affect the New York statute's application to the acts at issue here, including those that continued after June 21, 1991.

■ Furthermore, § 14.03 is not preempted more generally by other provisions of the Copyright Act. The Copyright Act establishes a test for preemption of state law, 17 U.S.C. § 301, which has been held to require a two-part analysis. First, "the work of authorship in which rights are claimed must fall within the 'subject matter of copyright' as defined in §§ 102 and 103 of the Act." *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 199–200 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Second, the state law must create " 'legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106' if it is to be preempted." *Id.* at 200. In the case of sculpture, these rights are those of reproduction, distribution, and preparation of derivative works. 17 U.S.C. § 106. In *Wojnarowicz v. American Family Ass'n*, 745 F.Supp. 130, 135 (S.D.N.Y.1994), decided after VARA had been enacted, but before its effective date, the court, applying this test, held § 14.03 not to be preempted, because the Copyright Act, unlike § 14.03, did not authorize "a copyright owner other than the creator to publish or display an altered work, *attributing that altered work to the original creator....*" *Id.* at 136 (emphasis in original). *See also Schatt v. Curtis Management Group, Inc.*, 764 F.Supp. 902, 911 n. 14 (S.D.N.Y. May 22, 1991) (following *Wojnarowicz* subsequent to VARA's effective date, without further comment). Moreover, in acknowledging VARA's imminent effectiveness, *Wojnarowicz* noted that if enacted, VARA "would arguably preempt state laws such as [§ 14.03] which currently provide similar rights." *Id.* at 136 n. 2. The reasoning in *Wojnarowicz* remains sound. Indeed, the fact that VARA was eventually added to the Copyright Code, granting authors rights similar to those provided by § 14.03, indicates that the rights granted by § 14.03 are not equivalent to those in the pre-VARA Code.

For the purpose of this action, then, Pavia's claim under § 14.03 is not annulled by VARA. For all of these reasons, the Moving Defendants' motion to dismiss Pavia's complaints against them arising under § 14.03 is granted as to the display before February 23, 1992, and denied as to the display thereafter.

### B. Count III

### 1. The Work and the Acts Alleged Fall Within the Ambit of VARA

Count III of Pavia's Complaint arises under VARA, which reads in pertinent part:

(a) ... the author of a work of visual art ...

> (3) ... shall have the right—

>> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

>> (B) to prevent any destruction of a work of recognized stature and any intentional or grossly negligent destruction of that work is a violation of that right....

VARA § 603, 17 U.S.C. § 106A(a)(3). In contrast to the New York statute, which prohibits the improper display of altered works, VARA lays its focus on the acts of alteration themselves, without reference to subsequent display.

■ As in Count V, Pavia asserts that the Defendants, by dismantling "The Ides of March," caused the work to be displayed improperly by distorting, altering, defacing, modifying and mutilating it, thus harming his honor and reputation as an artist. Continuing to take Pavia's factual allegations to be true for the purposes of this motion, "The Ides of March" falls within the category of works protected under VARA. VARA deems a sculpture to be a "work of visual art" if it is "existing in a single copy ... or in multiple cast, carved, or fabricated sculp-

tures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author." VARA § 602, 17 U.S.C. § 101. Despite the fact that it consists of four separate elements, "The Ides of March" is alleged to be a single work of art whose elements "form an integrated whole." *Carter v. Helmsley–Spear*, 861 F.Supp. 303, 314 (S.D.N.Y.1994) (holding "a number of sculptural elements including art work attached to the ceiling and the floor, interactive art, a vast mosaic covering the majority of the floor of the Lobby and portions of the walls and several sculptural elements" to be "a single work of art whose elements are interrelated.") As a single piece, "The Ides of March" thus meets the statutory definition of "work of visual art" for the purposes of this motion. Furthermore, Pavia's allegations that alteration of the work of art has prejudiced his honor and reputation are sufficient to bring the acts within the scope of VARA.

### 2. The "Ides of March" Does Not Fall Outside VARA's Ambit Simply Because It Was Created Before VARA's Effective Date

The fact that "The Ides of March" was created before VARA became law does not in itself remove the sculpture from the ambit of protected works. "Works of visual art created before the effective date" of VARA are protected if "title has not, as of such effective date, been transferred from the author." VARA § 610(b)(2), 17 U.S.C. § 106A(d)(2). "The Ides of March" was created in 1963. VARA became effective on June 1, 1991, six months after its passage. Section 610(a), 104 Stat. 5128, 17 U.S.C. 106A Note. Pavia asserts that he has never transferred title to "The Ides of March." For the purposes of this motion, then, "The Ides of March" is not excluded from VARA's ambit simply because its creation predated VARA's effective date.

### 3. The Claim is Barred Because the Acts Took Place Before VARA's Enactment

The acts committed by the Moving Defendants do not give rise to a claim.

VARA exempts from its scope acts which "occurred before [its] effective date." VARA § 610(b)(2), 17 U.S.C. § 106A note. But unlike the New York statute, which explicitly proscribes improper display, rights under VARA arise from the actual acts of "distortion, mutilation, or other modification." VARA § 603, 17 U.S.C. § 106A(a)(3). VARA does not state whether, subsequent to the commission of those acts, continued, ongoing display of the altered work of art itself gives rise to a cause of action, as does § 14.03. Pavia asserts that the continued display constitutes ongoing mutilation. The construction of a statute, however, is one of law, not of fact. It is necessary, therefore, to determine if, for the purpose of applying § 610(b), and only for that purpose, distortion, mutilation, or modification "occurs" once or continues to occur as long as the altered piece is displayed.

Whether § 610(b) gives authors the right to stop the post-enactment display of works mutilated before enactment is a question of first impression. In the absence of any guidance from the statutory language or the courts, an examination of the purpose and legislative history of VARA is in order.

The copyright statutes ought to be reasonably construed, with a view to effecting the purposes intended by Congress. They ought not to be unduly extended by judicial construction to include privileges not intended to be conferred, nor so narrowly construed as to deprive those entitled to their benefit of the rights Congress intended to grant.

*Bobbs–Merrill Co. v. Straus*, 210 U.S. 339, 346, 28 S.Ct. 722, 724, 52 L.Ed. 1086 (1908). VARA was passed in order to protect the moral rights of visual artists. *See* H.R.Rep. No. 514, 101st Cong., 2d Sess., at 5 (1990) *reprinted in* 1990 U.S.C.C.A.N. 6915, 6915. The Act sought to include both the right of attribution, which "ensures that artists are correctly identified with the works of art they create, and that they are not identified with works created by others," *id.*, and the right of integrity, which "allows artists to protect their works against modifications and destructions that are prejudicial to their honors or reputations." *Id.* Moral rights are to

be distinguished from economic rights, which are held by the holder of the copyright in a work, *see* 17 U.S.C. § 106, and constitute the remainder of the rights created by the Copyright Code. *See* 17 U.S.C. §§ 106, 106A(b); *see generally* H.R.Rep. No. 101–514, at 14 (1990), *reprinted in* U.S.S.C.A.N. at 6924.

In according these new rights to artists, Congress sought to balance them against the prior expectations of other parties. With regard to the section of the bill that eventually became § 610, Congress "recognize[d] that the law modifies important understandings and responsibilities of the parties, and that it would not be appropriate to apply new standards to conduct occurring before the effective date." *Id.* at 23, *reprinted in* 1990 U.S.S.C.A.N. at 6933. Among these prior understandings, and at the root of VARA's passage, was the cession by an artist of the right to prevent alteration of his work. By including § 610(b) and avoiding retroactivity, Congress allowed those who had commissioned works before its effective date to maintain their privilege to alter those works, in line with the understanding of all parties to the pre-VARA transaction. The same intent is evident in § 610(b)(1), which gave moral rights to artists for works created before the effective date only if they had not already transferred title. Congress, then, could not have intended to give artists the right to prevent the continued display after VARA's effective date of works distorted, mutilated, or modified before that date.

Therefore, "distortion, mutilation, and modification", regardless of any possible broader meaning in the general context of the statute, does not arise from continued display for the purposes of applying § 610(b)(2), and the acts alleged by Pavia do not give rise to any rights under VARA.

#### 4. *The Issue of the Statute of Limitations as Applied to VARA Need Not Be Reached*

The Moving Defendants argue that the statute of limitations provides an additional cause to dismiss Pavia's claims arising under federal law. However, because the failure to state a claim is apparent from the application of § 610(b), the federal statute of limitations question need not be reached.

Thus, the acts alleged by Pavia do not give rise to rights under VARA, and Count III of Pavia's Complaint against the Moving Defendants is dismissed for failure to state a claim upon which relief can be granted.

### C. *Counts IV and VI*

Counts IV and VI similarly fail to state a claim upon which relief can be granted. Count IV is captioned "Interference With Copyright." There, Pavia only realleges and rewords the facts contained in his other claims, reiterating that Defendants "have willfully and maliciously infringed [his] copyright by permitting to be shown and showing the work of art in a distorted, altered, defaced, modified and mutilated form," causing him damage as the sole and exclusive holder of the copyright to "The Ides of March."

Count VI is captioned "Copyright Infringement to the Copyright Laws of the United States, 17 U.S.C. Section 101 *et seq.*" Like Count IV, it realleges damage to Pavia's reputation as an artist and distortion, alteration, defacement, modification, and mutilation of "The Ides of March."

Neither Count IV nor Count VI presents a tenable claim distinguishable from those raised under § 14.03 and VARA. Neither federal nor New York law provides a common law or a statutory cause of action for "interference with copyright" as such. If Pavia intended to raise a non-copyright tort claim in Count IV, such as interference with contract or interference with business relations, he has failed to do so.

If Pavia intended to raise a further claim under § 14.03 or VARA, then he has failed to do so as well, since no additional facts are alleged that would change the reasoning in the discussions of Counts III and V.

If Pavia intended to assert another copyright claim, he has similarly failed to do so. Count VI suggests that Pavia intends to assert additional claims under the Copyright Code. Pavia alleges that he holds the copyright to "The Ides of March," providing him with a separate cause of action. However, assuming for the purposes of this discussion that Pavia does hold the copyright to the

sculpture, he still fails to state a claim. A copyright owner's rights are limited to those set forth in 17 U.S.C. § 106. As noted above, in the case of sculpture, they include the rights of reproduction, preparation of derivative works, and distribution. Pavia has alleged no facts that suggest that these rights have been infringed. Nor does the status of copyright owner give a party any additional rights under VARA, since "[o]nly the author of a work of visual art has the rights conferred by [VARA] in that work, whether or not the author is the copyright owner." 17 U.S.C. § 106A(b).

Counts IV and IV against the Moving Defendants are therefore dismissed.

### D. *Jurisdiction*

This court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367(a). However, "[p]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Indeed, a court may decline jurisdiction where it has dismissed all claims over which it has original jurisdiction, or where the claim raises a novel or complex issue of state law. 28 U.S.C. § 1367(c). However, in the absence of any motions on these jurisdictional grounds, the question of jurisdiction will not be reached in the disposition of this motion.

### Conclusion

The motion to dismiss Counts III, IV, and VI against the Moving Defendants under Rule 12(b)(6) is granted with leave to replead. The motion to dismiss Count V against the Moving Defendants under Rule 12(b)(6) is granted as to those claims arising from improper display of "The Ides of March" before February 23, 1992, with leave to replead, and denied as to improper display thereafter.

It is so ordered.